IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

RUTH RIVERA COLON,

    Plaintiff,

    v.                         CIVIL NO. 06-1461 (RLA)

KAREN G. MILLS, ADMINISTRATOR,
U.S. SMALL BUSINESS
ADMINISTRATION,[1]

    Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant has moved the Court to enter summary judgment in these proceedings and to dismiss plaintiff's complaint. The Court having reviewed the arguments presented by the parties as well as the evidence submitted in support thereof hereby rules as follows.

Plaintiff filed the instant complaint alleging sex discrimination, retaliation and retaliatory harassment in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a)(1) *et seq.* In essence, plaintiff claims that her two-day suspension and eventual termination from employment were due to gender (female) discrimination and retaliation. Additionally she alleges that she was subjected to retaliatory harassment.

---

[1] Karen G. Mills became Administrator of the U.S. Small Business Administration on April 3, 2009. Accordingly, she is automatically substituted for Stephen C. Preston as the proper party defendant. See Rule 25(d) Fed. R. Civ. P.

## I. SUMMARY JUDGMENT STANDARD

Rule 56(c) Fed. R. Civ. P., which sets forth the standard for ruling on summary judgment motions, in pertinent part provides that they shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Sands v. Ridefilm Corp., 212 F.3d 657, 660-61 (1st Cir. 2000); Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 45 (1st Cir. 1999). The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record. DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997). A genuine issue exists if there is sufficient evidence supporting the claimed factual disputes to require a trial. Morris v. Gov't Dev. Bank of Puerto Rico, 27 F.3d 746, 748 (1st Cir. 1994); LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), *cert. denied*, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994). A fact is material if it might affect the outcome of a lawsuit under the governing law. Morrissey v. Boston Five Cents Sav. Bank, 54 F.3d 27, 31 (1st Cir. 1995).

"In ruling on a motion for summary judgment, the Court must view 'the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor.'" Poulis-Minott v. Smith, 388 F.3d 354, 361 (1st Cir. 2004) (citing Barbour v.

Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995)). "In marshaling the facts for this purpose we must draw all reasonable inferences in the light most favorable to the nonmovant. That does not mean, however, that we ought to draw *unreasonable* inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective." Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 8 (1st Cir. 2007) (internal citation omitted italics in original).

Credibility issues fall outside the scope of summary judgment. "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). *See also*, Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 432 (1st Cir. 2000) ("court should not engage in credibility assessments."); Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37, 49 (1st Cir. 1999) ("credibility determinations are for the factfinder at trial, not for the court at summary judgment."); Perez-Trujillo v. Volvo Car Corp., 137 F.3d 50, 54 (1st Cir. 1998) (credibility issues not proper on summary judgment); Molina Quintero v. Caribe G.E. Power Breakers, Inc., 234 F.Supp.2d 108, 113 (D.P.R. 2002). "There is no room for credibility determinations, no room for the measured weighing of conflicting

evidence such as the trial process entails, and no room for the judge to superimpose his own ideas of probability and likelihood. In fact, only if the record, viewed in this manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment." <u>Cruz-Baez v. Negron-Irizarry</u>, 360 F.Supp.2d 326, 332 (D.P.R. 2005) (internal citations, brackets and quotation marks omitted).

In cases where the non-movant party bears the ultimate burden of proof, he must present definite and competent evidence to rebut a motion for summary judgment, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 256-257, 106 S.Ct. 2505, 91 L.Ed.2d 202; <u>Navarro v. Pfizer Corp.</u>, 261 F.3d 90, 94 (1st Cir. 2000); <u>Grant's Dairy v. Comm'r of Maine Dep't of Agric.</u>, 232 F.3d 8, 14 (1st Cir. 2000), and cannot rely upon "conclusory allegations, improbable inferences, and unsupported speculation". <u>Lopez-Carrasquillo v. Rubianes</u>, 230 F.3d 409, 412 (1st Cir. 2000); <u>Maldonado-Denis v. Castillo-Rodríguez</u>, 23 F.3d 576, 581 (1st Cir. 1994); <u>Medina-Muñoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990).

Any testimony used in support of discriminatory motive in a motion for summary judgment setting must be admissible in evidence, i.e., based on personal knowledge and otherwise not contravening evidentiary principles. Rule 56(e) specifically mandates that affidavits submitted in conjunction with the summary judgment mechanism must "be made on personal knowledge, shall set forth such

facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Hoffman v. Applicators Sales and Serv., Inc., 439 F.3d 9, 16 (1st Cir. 2006); Nieves-Luciano v. Hernandez-Torres, 397 F.3d 1, 5 (1st Cir. 2005); Carmona v. Toledo, 215 F.3d 124, 131 (1st Cir. 2000). See also, Quiñones v. Buick, 436 F.3d 284, 290 (1st Cir. 2006) (affidavit inadmissible given plaintiff's failure to cite "supporting evidence to which he could testify in court"). Additionally, the document "must concern facts as opposed to conclusions, assumptions, or surmise", Perez v. Volvo Car Corp., 247 F.3d 303, 316 (1st Cir. 2001), not conclusory allegations Lopez-Carrasquillo v. Rubianes, 230 F.3d at 414.

"To the extent that affidavits submitted in opposition to a motion for summary judgment merely reiterate allegations made in the complaint, without providing specific factual information made on the basis of personal knowledge, they are insufficient. However, a party's own affidavit, containing relevant information of which he has firsthand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 53 (1st Cir. 2000) (internal citations and quotation marks omitted).

"A court is not obliged to accept as true or to deem as a disputed material fact each and every unsupported, subjective, conclusory, or imaginative statement made to the Court by a party."

CIVIL NO. 06-1461 (RLA)                                          Page 6

Garcia v. Bristol-Myers Squibb Co., 535 F.3d 23, 31 n.5 (1st Cir. 2008) (internal citation, brackets and quotation marks omitted).

## II. **THE FACTS**

The Court finds the following material facts uncontested for purposes of this Order.

Plaintiff was a career employee with the Small Business Administration's ("SBA") Disaster Program in Puerto Rico since 1989.

At all times relevant to her complaint, plaintiff was a Grade 13 supervisor for SBA's Puerto Rico District Office ("PRDO").

In or about **November 2002**, plaintiff, along with ANA M. DEL TORO and JOSE A. IBERN, two other supervisors at PRDO, submitted an informal complaint to the Agency's Ad hoc Committee on Sexual Harassment for Investigation. The complaint accused senior management at PRDO of favoring a female employee with employment benefits not provided to other employees. Complainants requested that their identity remain anonymous.

On **December 17, 2002**, plaintiff and the two other complainants were informed that the Ad hoc Committee had investigated their complaint and had determined that there was no basis for their claims.

On **February 20, 2003**, the PRDO held a training session on the Agency's Telecommuting Program. EFRAIN PARDO, PRDO Deputy District Director, and IVAN IRIZARRY, PRDO District Director, were present during the training.

CIVIL NO. 06-1461 (RLA)                                          **Page 7**

On **March 4, 2003,** GERMAN HERNANDEZ, PRDO Agency Attorney Advisor, sent a memo to PARDO expressing his concern regarding derogatory comments concerning the Telecommuting Program he had overheard plaintiff making to other employees.

On **March 11, 2003,** IRIZARRY was forwarded the minutes from the Local Partnership Council February 28, 2003 meeting, wherein the Union representatives present thereat pointed to employee complaints about plaintiff's continued comments to them that their positions would be eliminated or contracted out if they participated in the Telecommuting Program. The Union indicated that the employees felt threatened and anxious due to the aforementioned comments made by a supervisor. It requested that plaintiff be instructed to cease and desist from this practice and for management to take action on the matter.

On **March 25, 2003,** PARDO issued plaintiff a letter proposing a two-day suspension for unprofessional conduct regarding her behavior during the telecommuting training session.

On **April 3, 2003,** plaintiff submitted her written response to the proposed suspension.

On **April 24, 2003,** IRIZARRY issued a decision letter sustaining the charge of unprofessional conduct against plaintiff. The letter explained that the suspension would take place on **May 5th and 6th 2003.**

On **June 30, 2003,** plaintiff contacted an EEO Counselor regarding her two-day suspension.

Beginning late **2003** and continuing through early **2004** the Agency transformed its liquidation function,[2] in part by centralizing the liquidation staff in Herndon, Virginia. The creation and staffing of the centralized center would eliminate the need for each district office to employ its own staff of liquidators.

On **September 9, 2003,** the Agency entered into a Memorandum of Understanding ("MOU") with the American Federation of Government Employees ("AFGE") Council 228. Pursuant to the MOU, district office staff at the GS-9 grade level and above who reported performing liquidation functions of 25% or more in the most recent cost allocation survey would be directly reassigned to the new center.

The language in the MOU did not distinguish the disaster funded employees from the regular SBA funded employees.

Pursuant thereto, 114 employees were given directed reassignments: 67 males and 47 females.

Further, none of the individuals who plaintiff implicated in any of her complaints and grievances was involved in the formulation and negotiation of the criteria used for reassignment.

On the most recent cost allocation survey completed by the Agency in May 2003, plaintiff's response reflected that she spent 35% of her time on liquidation activities.

On **September 10, 2003,** the Agency sent to 171 employees - including plaintiff - a letter offering separation incentives by

---

[2]  Term used for collecting on defaulted loans.

means of a "buy out." The letter also apprised the employees that they would be affected by future reassignments.

On **September 12, 2003,** JUAN LOPEZ, plaintiff's subordinate at the Disaster Program who also received a letter, contacted MS. HAYMES, an Office of Human Capital Management employee, to inquire whether the letters had been mistakenly sent to them inasmuch as they were employed at the disaster program.[3] MS. HAYMES responded that the letters were correct. LOPEZ then e-mailed PARDO requesting clarification of the situation.

On **September 12, 2003,** PARDO sent plaintiff and LOPEZ an e-mail apologizing for the confusion and informing them that the letter was not a mistake and that Disaster Program employees were included in the reassignment process.

On **December 1, 2003,** MONIKA HARRISON, Chief Human Capital Officer, sent letters to 60 employees - including plaintiff - giving them notice of their direct reassignment to Herndon, Virginia. The letter allowed employees 15 days to either accept or decline the reassignment.

On **December 17, 2003,** SUSAN WALTHALL, Deputy Associate Administrator for Field Operations, sent plaintiff a letter proposing her removal for failure to accept the directed reassignment. The letter admonished plaintiff that she had until **January 5, 2004,** to

---

[3] PRDO co-worker LEOCADIO MEDINA, a regular funded SBA employee, also received a directed reassignment. However, he died on December 6, 2003.

give her response either verbally or in writing to JOHN WHITMORE, counselor to the SBA Administrator.

On **January 5, 2004,** plaintiff sent a letter to WHITMORE requesting special consideration. She petitioned the Agency to take into account her health and family problems, education issues and the financial hardship that the directed reassignment would have upon her.

On **January 6, 2004,** WHITMORE informed plaintiff that he could not grant her request and that she would be removed effective **January 24, 2004,** for failure to accept the directed reassignment.

### III. <u>SUSPENSION - TIMELINESS</u>

Defendant seeks to dismiss plaintiff's discriminatory challenges to her suspension, as set forth in her June 30, 2003 EEO initial contact, as untimely.

The United States, as a sovereign, is immune from suit unless it waives its immunity by consenting to be sued. *See*, <u>United States v. Mitchell</u>, 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."). In 1972 - by way of an amendment to the Civil Rights Act of 1964 - federal employees as well as applicants to federal employment were allowed to vindicate claims of discrimination in employment based on "race, color, religion, sex, or national origin" via judicial proceedings. 42 U.S.C. § 2000e-16(a).  These remedies

are exclusive and mandate that employees first exhaust the pertinent administrative steps prior to resorting to the court for relief. Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 94, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990); Brown v. Gen. Servs. Admin., 425 U.S. 820, 829-30, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976). Hence, federal agencies "may only be sued in federal court if the aggrieved employee... has exhausted all available administrative remedies. Misra v. Smithsonian Astrophysical Observatory, 248 F.3d 37, 40 (1st Cir. 2001). "[P]laintiffs could not proceed under Title VII without first exhausting administrative remedies." Lebron-Rios v. U.S. Marshal Serv., 341 F.3d 7, 13 (1st Cir. 2003). "Judicial recourse under Title VII, however, is not a remedy of first resort...." Morales-Vallellanes v. Potter, 339 F.3d 9, 18 (1st Cir. 2003). Plaintiff's "Title VII cause of action is limited to those discrimination and retaliation allegations in his ... complaint that were previously the subject of a formal EEO complaint." *Id.*

The Equal Employment Opportunity Commission ("EEOC") was assigned the responsibility of establishing the mechanisms and deadlines for employees and applicants to employment to initiate the administrative process for claims based on discrimination encompassed within Title VII. *See* 42 U.S.C. § 2000e-16(b). The regulations issued thereunder provide that aggrieved employees must bring the discriminatory events to the attention of an EEO Counselor "within 45 days of the date of the matter alleged to be discriminatory, or in

the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1) (1999). The regulations further provide that the 45-day term may be extended under specific equitable circumstances to be proven by the individual. § 1614.105(a)(2).

Failure to contact the counselor within the 45-day term provided by the regulations causes plaintiff to lose the right to subsequently bring suit in court. Roman-Martinez v. Runyon, 100 F.3d 213, 217 (1st Cir. 1996). "[T]he law is clear that a federal employee filing a Title VII action must contact an EEO counselor within 30[4] days of the event that triggers his claim." Jensen v. Frank, 912 F.2d 517, 520 (1st Cir. 1990). *See also*, Velazquez-Rivera v. Danzig, 234 F.3d 790, 794 (1st Cir. 2000) (administrative remedies not exhausted since no contact with EEOC counselor within the 45 days required by the regulations).

"[I]n a Title VII case, a plaintiff's unexcused failure to exhaust administrative remedies effectively bars the courthouse door." Jorge v. Rumsfeld, 404 F.3d 556, 564 (1st Cir. 2005).

Plaintiff's initial contact with the EEO Counselor to complain of discrimination regarding her suspension on May 4 and 5, 2003, took place on June 30, 2003. That is, beyond the 45-day term provided in the regulations. Plaintiff has attempted to show cause for having the

---

[4]   The period for initially contacting the EEO counselor was originally 30 days. This term was extended to 45 days in the regulations effective 1992.

term extended arguing that it was not until May 20, 2003, that she become aware that her 2002 informal complaint had been made public and allegedly learned about the disparate treatment afforded HECTOR NARVAEZ, another PRDO supervisor.

Because we find that plaintiff has failed to meet her burden to challenge the validity of her suspension on Title VII grounds we need not address the timeliness argument.

## IV. SUSPENSION - DISCRIMINATION

Plaintiff claims that her two-day suspension was discriminatory because men were treated more favorably than women at the Agency.

"When... direct evidence is lacking to support a discrimination claim, the plaintiff must rely on establishing a prima facie case through the familiar steps of the [*McDonnel Douglas*] burden-shifting framework." Moron-Barradas v. Dep't of Educ., 488 F.3d 472, 480 (1st Cir. 2007). "[T]he burden for establishing a prima facie case is not onerous." Douglas v. J.C. Penney Co., Inc., 474 F.3d 10, 14 (1st Cir. 2007).

"Disparate treatment cases ordinarily proceed under the three-step, burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, the plaintiff must establish, by a preponderance of the evidence, a prima facie case of discrimination. Second, if the plaintiff makes out this prima facie case, the defendant must articulate a legitimate, nondiscriminatory explanation for its actions. Third, if

the defendant carries this burden of production, the plaintiff must prove by a preponderance that the defendant's explanation is a pretext for unlawful discrimination. The burden of persuasion remains at all times with the plaintiff." Mariani-Colon v. Dept. of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 221 (1st Cir. 2007) (citation and internal quotation marks omitted); Douglas, 474 F.3d at 14.

"Generally, a plaintiff establishes a prima facie case of discrimination by showing: 1) he is a member of a protected class, 2) he is qualified for the job, 3) the employer took an adverse employment action against him, and 4) the position remained open, or was filled by a person with similar qualifications. This burden is not onerous, as only a small showing is required." Mariani-Colon, 511 F.3d at 221-22 (citation and internal quotation marks omitted); Douglas, 474 F.3d at 13-14. See also, Moron-Barradas, 488 F.3d at 481 (prima facie case established by presenting evidence that (1) plaintiff was "a member of a protected class, (2) she applied and was qualified for the... position, and... (3) was rejected... and (4) [defendant] hired someone with similar or lesser qualifications").

Once plaintiff has complied with this initial prima facie burden the defendant must "articulate a legitimate nondiscriminatory reason" for the challenged conduct at which time presumption of discrimination fades and the burden then falls back on plaintiff who must then demonstrate that the proffered reason was a "pretext" and that the decision at issue was instead motivated by discriminatory

animus.  Rivera-Aponte v. Rest. Metropol #3, Inc., 338 F.3d 9, 11 (1st Cir. 2003); Gu v. Boston Police Dept., 312 F.3d 6, 11 (1st Cir. 2002); Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002); Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d 40, 44-45 (1st Cir. 2002); Feliciano v. El Conquistador, 218 F.3d 1, 5 (1st Cir. 2000); Santiago-Ramos, 217 F.3d. at 54.  "At this third step in the burden-shifting analysis, the *McDonnell Douglas* framework falls by the wayside because the plaintiff's burden of producing evidence to rebut the employer's stated reason for its employment action merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination."  Feliciano, 218 F.3d at 6 (citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)) (internal citations and quotation marks omitted).

Defendant's "burden is one of production, not persuasion" Reeves, 530 U.S. at 142, and "[a]t all times, the plaintiff bears the 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" Gu v. Boston Police Dept., 312 F.3d at 11 (citing Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. at 253). *See also*, Reeves, 530 U.S. at 143.

"Upon the emergence of such an explanation, it falls to the plaintiff to show both that the employer's proffered reasons is a sham, and that discriminatory animus sparked its actions." Cruz-Ramos v. Puerto Rico Sun Oil Co., 202 F.3d 381, 384 (1st Cir. 2000)

(citation and internal quotation marks omitted). "The plaintiff must then show, without resort to the presumption created by the prima facie case, that the employer's explanation is a pretext for... discrimination." Rivera-Aponte v. Rest. Metropol # 3, Inc., 338 F.3d at 11.

Thus, in a summary judgment context the court must determine "whether plaintiff has produced sufficient evidence that [s]he was discriminated against due to [her sex] to raise a genuine issue of material fact." Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d at 45; Rivas Rosado v. Radio Shack, Inc., 312 F.3d 532, 534 (1st Cir. 2002). Summary judgment will be denied if once the court has reviewed the evidence submitted by the parties in the light most favorable to the plaintiff it finds there is sufficient evidence from which a trier of fact could conclude that the reasons adduced for the charged conduct are pretextual and that the true motive was discriminatory. Santiago-Ramos v. Centennial, 217 F.3d at 57; Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 20 (1st Cir. 1999).

However, in the context of a summary judgment "'the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a question for a factfinder as to pretext and discriminatory animus.'" Calero-Cerezo v. U.S. Dep't of Justice, 355

CIVIL NO. 06-1461 (RLA)                                    Page 17
_____

F.3d 6, 26 (1ˢᵗ Cir. 2004) (citing <u>Fennell v. First Step Designs, Ltd.</u>, 83 F.3d 526, 535 (1ˢᵗ Cir. 1996)).

     "Proof of more than [plaintiff's] subjective belief that [s]he was the target of discrimination however, is required. In order to establish a disparate treatment claim, a plaintiff must show that others similarly situated to [her] in all relevant respects were treated differently by the employer." <u>Mariani-Colon</u>, 511 F.3d at 222 (citations and internal quotation marks omitted).

     "To survive a defendant's motion for summary judgment on a discrimination claim, a plaintiff must produce sufficient evidence to create a genuine issue of fact as to two points: 1) the employers' articulated reasons for its adverse actions were pretextual, and 2) the real reason for the employers' actions was discriminatory animus based on a protected category." *Id*. at 223.

     "At the third stage of the *McDonnell Douglas/Burdine* framework, the ultimate burden is on the plaintiff to persuade the trier of fact that she has been treated differently because of her [sex]." <u>Thomas v. Eastman Kodak Co.</u>, 183 F.3d 38, 56 (1ˢᵗ Cir. 1999). "Plaintiff may use the same evidence to support both conclusions [pretext and discriminatory animus], provided that the evidence is adequate to enable a rational factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action." <u>Thomas</u>, 183 F.3d at 57 (citation and internal quotation marks omitted).

The fact that the reasons proffered by the employer are discredited by plaintiff does not automatically mandate a finding of discrimination. "That is because the ultimate question is not whether the explanation was false, but whether discrimination was the cause of the [conduct at issue]. We have adhered to a case by case weighing. Nonetheless, disbelief of the reason may, along with the prima facie case, on appropriate facts, permit the trier of fact to conclude the employer had discriminated." Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d at 45 (citations omitted); Reeves, 530 U.S. at 147-48. Plaintiff's challenges to defendant's proffered reasons is not sufficient to meet his burden. See, Ronda-Perez v. Banco Bilbao Vizcaya, 404 F.3d 42, 44 (1st Cir. 2005). Rather, "[t]he question to be resolved is whether the defendant's explanation of its conduct, together with any other evidence, could reasonably be seen by a jury not only to be false but to suggest [sex]-driven animus." Id. See also, Candelario Ramos v. Baxter Healthcare Corp. of P.R., 360 F.3d 53, 56 (1st Cir. 2004).

For purposes of the summary judgment request presently before us "'the focus should be on the ultimate issue: whether, viewing the aggregate package of proof offered by the plaintiff and taking all inferences in the plaintiff's favor, the plaintiff has raised a genuine issue of fact as to whether the [suspension and] termination of the plaintiff's employment was motivated by [sex]

discrimination.'" <u>Rivas Rosado</u>, 312 F.3d at 535 (citing <u>Dominguez-Cruz</u>, 202 F.3d at 430-31).

### A. GENDER-BASED DISCRIMINATION

Plaintiff claims that her two-day suspension from work was discriminatory because a similarly-situated male supervisor with a record of alleged incidents of unprofessional conduct at the workplace was treated more favorably.

"A plaintiff can demonstrate that an employer's stated reasons are pretextual in any number of ways, including by producing evidence that plaintiff was treated differently from similarly situated employees. To successfully allege disparate treatment, a plaintiff must show that others similarly situated to her in all relevant respects were treated differently by the employer. The comparison cases need not be perfect replicas, but they must closely resemble one another in respect to relevant facts and circumstances." <u>Garcia</u>, 535 F.3d at 31 (internal citations, brackets and quotation marks omitted). *See also*, <u>Rivera Aponte</u>, 338 F.3d at 12 ("[A] claim of disparate treatment based on comparative evidence must rest on proof that the proposed analogue is similarly situated in all material respects.") (quotation omitted).

"It is fundamental that a claim of disparate treatment based on comparative evidence must rest on proof that the proposed analogue is similarly situated in all material respects. The comparison cases need not be perfect replicas. Rather, the test is whether a prudent

person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Thus, in offering this comparative evidence, [plaintiff] bears the burden of showing that the individuals with whom she seeks to be compared have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Rodriguez-Cuervos, 181 F.3d at 21 (citations and internal quotation marks omitted).

In Rodriguez-Cuervos, plaintiff was able to establish that the reasons proffered for his demotion were inaccurate and that plaintiff was treated differently from other managers. However, plaintiff could not prevail in his Title VII claim because he failed to present evidence that the actions taken had been motivated by discriminatory animus. The court explained that "the fatal weakness in [plaintiff's] case [was] his failure to present any evidence that [his employer's] actions were predicated on the basis of [Title VII protected characteristics]. Unfortunately for [plaintiff], Title VII does not stop a company from demoting an employee for any reason - fair or unfair - so long as the decision to demote does not stem from a protected characteristic". Rodriguez-Cuervos, 181 F.3d at 22.

For purposes of our ruling we shall assume that plaintiff met her prima facie claim of gender discrimination. She is a female, was qualified for and adequately performing the duties of her position

and the two-day suspension constitutes an adverse personnel action. "'In disparate treatment cases, comparative evidence is to be treated as part of the pretext analysis, and not as part of the plaintiff's prima facie case.'" <u>Garcia</u>, 535 F.3d at 31 (citing <u>Kosereis v. Rhode Island</u>, 331 F.3d 207, 213 (1st Cir. 2003)).

In this particular case, defendant has pointed to plaintiff's conduct to justify her suspension. Hence, we must determine whether or not plaintiff has adduced sufficient evidence to demonstrate that the reason proffered by SBA is but a pretext and that her suspension was motivated instead by her gender. Thus, we shall focus on the reasons proffered by defendant to ascertain whether or not these were pretextual and to determine whether or not similarly situated males were treated more favorably.

Plaintiff was suspended for two days based on her behavior during a Telecommuting Training. Both the letter giving plaintiff notice of her proposed suspension based on unprofessional conduct dated March 25, 2003 - which was subscribed by PARDO - as well as the final determination made by IRIZARRY on April 3, 2003, clearly identify the underlying conduct resulting in the adverse action as well as the source of the information underlying the charges.

It is important to note that several witnesses concurred that plaintiff's behavior during the Telecommuting Training was inappropriate. The fact that other persons present at the training

CIVIL NO. 06-1461 (RLA)                                    Page 22

may have perceived the events differently does not necessarily render the suspension discriminatory.

Additionally, subsequent to the training, PRDO management was made aware of Union and employee concerns regarding plaintiff's public negative comments regarding the purpose and effect of the Telecommuting Program.

According to the minutes of the February 28, 2003 Local Partnership Council meeting, which IRIZARRY also attended, "[t]he union indicated that Ms. Ruth Rivera has been saying in her division and at other divisions in the office that she was not going to allow her employees to participate in the telecommuting program. Also, that employees who participate in the program will loose (sic) their jobs. **Employees feel threatened and anxious when these comments come from a supervisor since her comments are unfounded, they want Ms. Rivera to cease and desist from this practice. They want management to take action and to inform them of the action taken**." (Emphasis ours). E-mail from IRIZARRY to Helen Jacobson dated March 20, 2003 (docket No. 63-13).

On March 4, 2003, PARDO received a subsequent complaint from GERMAN HERNANDEZ, PRDO's Attorney Advisor, Legal Division, addressing plaintiff's negative comments regarding the purpose of the program as a means to get rid of the employees and its detrimental effect on the Agency's plans.

CIVIL NO. 06-1461 (RLA)                                      **Page 23**

The fact that plaintiff, as a supervisor, was publicly undermining the Agency's efforts further aggravated the nature of her conduct. This is also explained in both the March 25, 2003 and April 24, 2003 letters. In this regard, the April 23, 2003 suspension memorandum reads:

> Your conduct is serious in nature. Telling employees that their positions would or could be eliminated if they participate in the telecommuting program has a chilling effect on employee participation, undermines the Agency's initiative, and has an adverse impact on employee morale. Your comments resulted in increased employee anxiety about their employment. As a supervisor, you are responsible for supporting Agency policies and initiatives and for providing a positive role model for subordinate employees. Your conduct seriously erodes my confidence in your ability to fulfill responsibilities of your position in a professional and effective manner.

Memo from IRIZARRY to plaintiff (docket No. 63-15) pp. 1-2.

In support of her disparate treatment argument, plaintiff avers that HECTOR NARVAEZ, another Grade 13 supervisor: (1) was the object of a Union complaint for remarks made in the work place and was not disciplined; (2) was allowed the opportunity to rebut the Union's

allegations and (3) was responsible for two other incidents involving unprofessional conduct without any consequence.[5]

Plaintiff further contends that at least eight female employees and no males were reprimanded and/or suspended during IRIZARRY's tenure.

**1. Union Complaint.**

Plaintiff cites an incident involving NARVAEZ regarding derogatory comments of the Portfolio Management Division (PMD) staff made by a bank employee. According to plaintiff, NARVAEZ was responsible for spreading information which caused employees to request the Union's intervention.

Plaintiff's version of the events, however, substantially differs from the explanation given by PARDO who clarified that the letter at issue which gave rise to the general malaise of the PMD staff was not written nor made public by NARVAEZ. The following summarizes plaintiff's account of the incident:

On May 24, 2003, Mr. Joe Ibern informed me that Mr. Narvaez had sent a letter to Ms. Ana del Toro, PMD Chief.

_____

[5] Plaintiff's evidence regarding allegedly unprofessional conduct on the part of NARVAEZ as well as other incidents of alleged disparate treatment is not based on either documentary evidence or her personal knowledge but rather is premised on what IBERN, her supervisor, allegedly told her. Assuming, as plaintiff argues, that this information is not hearsay and it is admissible under Rule 801(d)(2)(D), as further discussed _infra_, we find the allegations too general to be useful to compare the circumstances to conclude that indeed both plaintiff and NARVAEZ were similarly situated or that females in general were more harshly penalized.

CIVIL NO. 06-1461 (RLA)                                           Page 25

          The letter had been prepared by Mr. Angel Santana at the
     request of Mr. Narvaez for an investigation into alleged
     comments from a bank employee about the PMD staff. The
     letter was insulting and accused the PMD division of being
     negligent among other things. When the PMD staff received
     a copy of this letter they felt humiliated and insulted.
     Mr. Luis Nuñez, one of the PMD employees, requested that
     the Union interfere in this situation and that Mr. Narvaez
     be reprimanded for his actions. The Union directive met
     with Mr. Pardo and Mr. Irizarry to discuss this complaint.
     Mr. Narvaez was called by Mr. Pardo and Mr. Irizarry to
     discuss the complaint brought up by the union and was aloud
     [sic] to write an apology to the employees. This was not
     the first time that the employees had complaint [sic] to
     the union or to Mr. Pardo and Mr. Irizarry about Mr.
     Narvaez' conduct. However, he was informed of the complaint
     giving him the opportunity to rebut the allegations and
     once again deal with the alleged complaint against him,
     thus avoiding that any type of disciplinary action be
     taken.

Interview Questions for RUTH RIVERA (docket No. 68-13) ¶ 7.

          According to PARDO, however, not only was the letter not written
by NARVAEZ but more importantly, NARVAEZ forwarded it to both his
immediate supervisor as well as the PMD supervisor for a meeting to

deal with the situation. Before the meeting took place the memorandum was improvidently disclosed by the PMD supervisor. Due to the conflict generated thereby, NARVAEZ apologized to the PMD staff for his employee's choice of words. Thus, there was no wrongdoing on the part of NARVAEZ.

MR. PARDO explained in detail the circumstances surrounding this incident which support our conclusion that this incident is distinguishable from plaintiff's situation.

As for Mr. Narvaez, he did not write a letter that was "insulting and that accused the PMD division of being negligent among other things". Mr. Narvaez forwarded a memo written by one of his employees to his immediate supervisor (ADD/ED), Jose Ibern and PMD supervisor Ana del Toro. In this memo, Mr. Narvaez' employee (not Mr. Narvaez) summarized findings and included a personal opinion regarding an issue raised by a participating lender. The reason Mr. Narvaez forwarded the memo to his immediate supervisor and PMD supervisor was to suggest a meeting to review the finding. However, this memo was inappropriately shared with the PMD staff by the PMD supervisor (Ana Del Toro) before any meeting. In so doing, she created a hostile atmosphere between her employees and Mr. Narvaez' employee. In order to ease the tension, Mr. Narvaez wrote a letter of apology to each of the PMD employees regarding

CIVIL NO. 06-1461 (RLA)                                          Page 27

his employee's editorializing. The conduct of Mr. Narvaez was not in question.

Request for Additional Information (docket No. 63-17) ¶ 7.

**2.   Opportunity to Rebut Charges.**

Contrary to her arguments, plaintiff was specifically allowed the opportunity to refute the charges leading to her suspension. Accordingly, we shall then proceed to address the instances of alleged disparate treatment listed by plaintiff.

**3.   Instances of Unprofessional Conduct.**

According to e-mails submitted by defendant (docket No. 68-11), during 1999 an employee named GLADYS M. JIMENEZ complained that NARVAEZ was continually asking her about her retirement plans. NARVAEZ's supervisor was instructed by PARDO to ensure NARVAEZ discontinued this practice.

Apart from the remoteness in time, we find nothing in NARVAEZ's behavior comparable to plaintiff's situation. It was a matter limited to the supervisor and the employee which did not have any effects on the other office personnel.

Plaintiff further claims that NARVAEZ made derogatory comments about one of his subordinates during a manager's meeting and no disciplinary action was taken even though the matter was brought to the attention of IRIZARRY.

Absent any details regarding the circumstances surrounding this alleged incident, we find it impossible to consider them as comparable to plaintiff's suspension.

Plaintiff also alleges that while male employees who had used "abusive and indecent language towards a female supervisor" were never counseled or reprimanded IRIZARRY requested that the female supervisor be counseled.  Again, we know nothing of the specifics to assess the relevance of this allegation.

In a conclusory fashion, plaintiff indicates that "[d]uring Mr. Irizarry's tenure in our office eight female employees have been reprimanded and/or suspended while no male employees have been subjected to any kind of disciplinary action for their unprofessional conduct". Interview Questions for RUTH RIVERA (docket No. 68-13) ¶ 7. This allegation, by itself, is useless for comparison purposes for the particular circumstances of each case are unknown.

Defendant having come forth with legitimate nondiscriminatory reasons for having suspended plaintiff, the evidentiary presumption of discrimination vanishes and the burden falls back upon plaintiff to demonstrate that the proffered grounds for suspension were a "pretext" and the decision was motivated instead by sex discrimination.

Similar to Garcia, "all of the instances of disparate treatment cited by [plaintiff] are either unsupported by the record or are distinguishable in important respects from the facts and

circumstances that [plaintiff] faced." *Id.*, 535 F.3d at 33 (internal citations and quotation marks omitted). Plaintiff has not presented sufficient admissible evidence to show that her male counterparts engaged in similar disrespectful and disruptive behavior and were not subject to disciplinary measures.

In sum, we find that plaintiff has failed in her burden of establishing that the reasons given for her suspension were pretextual and motivated instead by the fact that she was a female. Accordingly, the gender-based claim challenging her two-day suspension is hereby **DISMISSED.**

### B. RETALIATION

Plaintiff alleges that her suspension in April 2003 was in retaliation for having previously filed an informal sexual discrimination complaint against PARDO and IRIZARRY on or about November 7, 2002. In addition to plaintiff, the informal complaint was also subscribed by other two PRDO supervisors, ANA DEL TORO and JOSE IBERN. It was intended that the document remain confidential.

In their informal complaint the complainants charged that senior management officials had created a hostile work environment "by demanding sexual favors from subordinates and rewarding such employees with employment benefits and opportunities not afforded others or vice versa."[6] According to the document, the latest incident

_____

[6] E-mail from ANA M. DEL TORO to plaintiff and  IBERN dated November 7, 2002 (docket No. 63-7).

involved the appointment of ROSA LAGOMARSINI to the position of Administrative Officer/Business Opportunity Specialist following questionable procedures.

The informal complaint was submitted to the Agency's Ad Hoc Committee on Sexual Harassment for investigation. On December 17, 2002, complainants were informed that the Committee had determined that there was no basis for their claims.

"Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), states that it is unlawful for an employer to discriminate against an employee because 'he has opposed any practice made an unlawful employment practice..., or because he has made a charge, testified, assisted, or participated in any matter in an investigation, proceeding, or hearing.'" DeClaire v. Mukasey, 530 F.3d 1, 19 (1st Cir. 2008).

The interests sought to be protected by Title VII's anti-discrimination mandate differ from those underlying its retaliation clause. "The substantive provision seeks to prevent injury to individuals based on who they are, *i.e.*, their status. The anti-retaliation provision seeks to prevent harm to individuals based on what they do, *i.e.*, their conduct." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 63, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). "It therefore does not matter for retaliation purposes whether [the employer] would have treated a male [employee] the same way he treated [plaintiff]. The relevant question is whether [the employer]

was retaliating against [plaintiff] for filing a complaint, not whether he was motivated by gender bias at the time." DeClaire, 530 F.3d at 19.

Hence, for retaliation purposes "[t]he relevant conduct is that which occurred *after* [plaintiff] complained about his superior's [discriminatory] related harassment." Quiles-Quiles v. Henderson, 439 F.3d 1, 8 (1st Cir. 2006).

"The evidence of retaliation can be direct or circumstantial." DeClaire, 530 F.3d at 20. Unless direct evidence is available, Title VII retaliation claims may be proven by using the burden-shifting framework set forth in McDonnell Douglas. "In order to establish a prima facie case of retaliation, a plaintiff must establish three elements. First, the plaintiff must show that he engaged in a protected activity. Second, the plaintiff must demonstrate he suffered a materially adverse action, which caused him harm, either inside or outside of the workplace. The impact of this harm must be sufficient to dissuade a reasonable worker from making or supporting a charge of discrimination. Third, the plaintiff must show that the adverse action taken against him was causally linked to his protected activity." Mariani-Colon, 511 F.3d at 223 (citations and internal quotation marks omitted); Moron-Barradas, 488 F.3d at 481; Quiles-Quiles, 439 F.3d at 8.

"Under the *McDonnell Douglas* approach, an employee who carries her burden of coming forward with evidence establishing a prima facie

case of retaliation creates a presumption of discrimination, shifting the burden to the employer to articulate a legitimate, non-discriminatory reason for the challenged actions... If the employer's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for the challenged actions was in fact a pretext for retaliating." Billings v. Town of Grafton, 515 F.3d 39, 55 (1st Cir. 2008) (citations, internal quotation marks and brackets omitted).

"[A]n employee engages in protected activity, for purposes of a Title VII retaliation claim, by opposing a practice made unlawful by Title VII, or by participating in any manner in an investigation or proceeding under Title VII." Mariani-Colon, 511 F.3d at 224.

"[Title VII's] anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington, 548 U.S. at 67. In order to prevail on a retaliation claim "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 68. It is not necessary that the conduct at issue affect the employee's "ultimate employment decisions." Id. at 67.

According to Burlington, the determination of whether a particular action is "materially adverse" must be examined based on

**CIVIL NO. 06-1461 (RLA)**                                         **Page 33**

the facts present in each case and "should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* at 71 (citation and internal quotation marks omitted).

In reaching its decision in <u>Burlington</u>, the Supreme Court considered factors such as the fact that the duties of a position "were... more arduous and dirtier" when compared to the other position which "required more qualifications, which is an indication of prestige [] and... was objectively considered a better job". *Id.* (citation and quotation marks omitted).

In <u>Billings</u> the court distinguished between minor incidents which take place in the usual course of a work setting and have no import on an individual's decision to file a discrimination charge and those which might deter an employee from complaining of such conduct. Specifically, the court noted that "some of [the supervisor's] behavior - upbraiding [plaintiff] for her question at the Board of Selectmen meeting, criticizing her by written memoranda, and allegedly becoming aloof toward her - amounts to the kind of petty slights or minor annoyances that often take place at work and that all employees experience and that, consequently, fall outside the scope of the antidiscrimination laws... But we cannot say the same for the other incidents, namely, investigating and reprimanding [plaintiff] for opening the letter from [the supervisor's] attorney, charging her with personal time for attending her deposition in this

case, and barring her from the Selectmen's Office. While these measures might not have made a dramatic impact on [plaintiff's] job, conduct need not relate to the terms or conditions of employment to give rise to a retaliation claim. Indeed, we think that these actions, by their nature, could well dissuade a reasonable employee from making or supporting a charge of discrimination. An employee who knows that, by doing so, she risks a formal investigation and reprimand - including a threat of further, more serious discipline - for being insufficiently careful in light of her pending litigation as well as the prospect of having to take personal time to respond to a notice of deposition issued by her employer in that litigation, might well choose not to proceed with the litigation in the first place." Billings, 515 F.3d at 54 (citations, internal quotation marks and brackets omitted).

"It is true that an employee's displeasure at a personnel action cannot, standing alone, render it materially adverse... [but plaintiff] came forward with enough objective evidence contrasting her former and current jobs to allow the jury to find a materially adverse employment action." Id. at 53.

Depending on the particular set of facts at hand, "temporal proximity alone can suffice to meet the relatively light burden of establishing a prima facie case of retaliation." DeClaire, 530 F.3d at 19 (citation and internal quotation marks omitted). See also, Mariani-Colon, 511 F.3d at 224 ("[T]he 'temporal proximity' between

appellant's allegations of discrimination in June 2002 and his termination in August 2002 is sufficient to meet the relatively light burden of establishing a prima facie case of retaliation"); Quiles-Quiles, 439 F.3d at 8 ("[I]n proper circumstances, the causation element may be established by evidence that there was a temporal proximity between the behavior in question and the employee's complaint.")

"[T]here is no mechanical formula for finding pretext. One way to show pretext is through such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and with or without the additional evidence and inferences properly drawn therefrom infer that the employer did not act for the asserted non-discriminatory reasons." Billings, 515 F.3d at 55-56 (citations, internal quotation marks and brackets omitted).

Plaintiff carries the burden of presenting admissible evidence of retaliatory intent in response to a summary judgment request. The court need not consider unsupported suppositions. "While [plaintiff] engages in much speculation and conjecture, a plaintiff cannot defeat summary judgment by relying on conclusory allegations, or rank speculation. To defeat summary judgment, a plaintiff must make a colorable showing that an adverse action was taken for the purpose of

retaliating against him." <u>Mariani-Colon</u>, 511 F.3d at 224 (citations and internal quotation marks omitted).

Additionally, even though "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's discrimination, but doing so is not required, as there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory." <u>DeClaire</u>, 530 F.3d at 19-20 (italics in original).

Lastly, there are instances where issues of fact regarding the veracity of the allegedly pretextual reasons demand that trial be held to resolve them. *See i.e.*, <u>Billings</u>, 515 F.3d at 56 (citations and internal quotation marks omitted) ("But we think that, under the circumstances of this case, it is the jury that must make this decision, one way or another. As we have advised, where a plaintiff in a discrimination case makes out a prima facie case and the issue becomes whether the employer's stated nondiscriminatory reason is a pretext for discrimination, courts must be particularly cautious about granting the employer's motion for summary judgment. Such caution is appropriate here, given the factual disputes swirling around the transfer decision.")

Even though "[t]emporal proximity can create an inference of causation in the proper case... to draw such an inference, there must

be proof that the decisionmaker knew of the plaintiff's protected conduct when he or she decided to take the adverse employment action." Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 84 (1st Cir. 2006). *See also*, Freadman v. Metro. Prop. and Cas. Ins. Co., 484 F.3d 91, 106 (1st Cir. 2007) (no causal connection inasmuch as accommodation request made after decision to remove plaintiff made); Randlett v. Shalala, 118 F.3d 857, 862 (1st Cir. 1997) ("[T]he adverse action must have been taken for the *purpose* of retaliating. And to defeat summary judgment, a plaintiff must point to *some* evidence of retaliation by a pertinent decisionmaker.")

Initially we must point out that no evidence has been submitted to establish that either PARDO or IRIZARRY were aware of plaintiff's November 2002 informal complaint prior to May, 2003. Plaintiff's testimony to this effect is that on May 20, 2003, she learned that copies of the November 2002 complaint were circulating around the office. No specific persons or dates are mentioned in her deposition testimony. Rather, plaintiff concedes that she did not know when or how IRIZARRY or PARDO became aware of her previous complaint.

Rather, the evidence on record does show that PARDO, who initiated the suspension process by issuing the March 23, 2003 letter, did not learn about the allegations in the informal complaint

until May 21, 2003, that is, after plaintiff had already served her suspension on May 5 and 6, 2003.[7]

Further, as previously discussed in the context of plaintiff's gender-based discrimination claim, there was ample basis for PARDO to propose and for IRIZARRY to decide to suspend plaintiff.

Even more crucial to this issue is the fact that no disciplinary measures befell upon either of the other two signatories of the 2002 informal complaint.

Based on the foregoing, we find that plaintiff's retaliation theory as the motive for her May 2003 suspension is not legally plausible. Accordingly, this claim is hereby **DISMISSED**.

## V. TERMINATION

Plaintiff was terminated from her SBA employment effective January 24, 2003, due to her refusal to be reassigned to Virginia. Again, plaintiff challenges this determination both on gender bias (female) as well as retaliation pursuant to Title VII.

In support of its summary judgment request, defendant explained in detail the reasons for establishing a Guaranty Purchase/Liquidation Center in Herndon, Virginia in 2004; how the procedure and criteria for identifying employees to be reassigned was

---

[7]   According to PARDO, a November 7, 2002 memorandum identified as "Suggested changes - Attachment to Listing of Issue and Basis... was placed under the door of the Administrative Officer and given to [him] on 5/21/03. [He] was not aware that a 'complaint' had been filed on November 7, 2002; nor... of any of the allegations contained in such alleged complaint." Request for Additional Information (docket No. 63-17) ¶ 1 p. 1.  This testimony stands uncontested.

developed and applied, as well as events leading to plaintiff's termination.

Plaintiff moves us to discard these explanations as pretextual based on the following arguments: (1) the MOU did not apply to her because she was not a Union member; (2) an issue of fact remains as to whether or not disaster employees were eligible for reassignment; (3) the persons who decided that she was eligible for reassignment were aware of: (a) the disciplinary actions taken against her during 2002 and 2003, and (b) JOHN WHITMORE, the deciding official regarding her termination, was a member of Ad Hoc Committee that reviewed and dismissed the informal discrimination charge filed in November 2002, and (4) plaintiff was willing to accept the reassignment at a later date but her request was denied by WHITMORE.

JOHN WHITMORE explained that SBA underwent a "transformation effort... [which included] a systematic review of its programs and business processes."[8] One of the areas examined was the 7(a) guaranteed loan program whereby SBA guaranteed loans from participating lenders. During the past ten years, the Agency had been moving away from direct loan management to lender management shifting the responsibility over to the participating lenders. He concluded that "[a] major portion of the 7(a) loan guarantee activity is now done by participating 7(a) lenders. The lenders approve a majority of

---

[8] Interview Questions for JOHN WHITMORE (docket No. 63-21) ¶ 7 p.2.

the loan applications with little SBA involvement, do most of the servicing, and perform most of the liquidation work."[9] "[A]s of the end of December 2002, SBA serviced just 8% of the loans in liquidation while lenders were responsible for 92%. However, even with the shift to lender servicing and liquidation, the current process still required SBA District Office staff to spend a considerable amount of time on the loan liquidation function. As a result of the Agency's review of its liquidation/guarantee purchase process, the SBA concluded that the liquidation process could be improved and streamlined to further realign the liquidation process and the lenders' responsibilities."[10]

WHITMORE, who actively participated in the transformation process, further indicated that due to the positive results garnered from a March 2003 pilot project centralizing 7(a) loan liquidation activities from various district offices which showed that these "were more effectively and efficiently done through a centralized process" the SBA Administrator approved the establishment of a centralized guaranty purchase center on June 9, 2003.[11]

The plan called for a center to be established in the Washington, D.C. area - Herndon Center - "staffed with 40 field employees who had reported spending 25% or more of their time

---

[9]  Interview Questions for JOHN WHITMORE (docket No. 63-21) p. 2.

[10]  *Id.*

[11]  *Id.*

CIVIL NO. 06-1461 (RLA)                                    **Page 41**

performing liquidation activities".[12]   The issue was discussed with the Union and a Memorandum of Understanding along the following was reached:

1.   Current SBA district office staff at GS-9 and above who reported performing liquidation functions at least 25% of the time in the most recent agency cost allocation study would be directly reassigned to the new center;

2.   SBA would offer an early retirement option for all Agency personnel and a buy-out option for individuals directly involved in the liquidation function;

3.   Employees who opted for the buyout offer would be off the Agency rolls by September 30, 2003;

4.   The letters affecting employees to be directly reassigned would allow for a 15 day response time and a 30 day reporting date; and

5.   The process to be used for employees to be directly reassigned would be reverse seniority.

Interview Questions for JOHN WHITMORE (docket No. 63-21) ¶7 p. 3; see also, Memorandum of Understanding Between SBA and AFGE Council 228 (docket No. 63-19).

On September 10, 2003, SBA sent letters to 171 individuals, including plaintiff, who were at the GS-9 level and above who had

---

[12]   Interview Questions for JOHN WHITMORE (docket No. 63-21) ¶7 p. 2.

CIVIL NO. 06-1461 (RLA)                                      **Page 42**

reported to be performing liquidation activities of 25% or more in the most recent cost allocation survey. The recipients were advised that they would be directly affected by reassignments unless they opted for the buy-out alternative. Out of the 171 individuals who were issued the letters, 70 initially opted for the buyout but only 47 ultimately took it.

On November 7, 2003, the Agency solicited volunteers to relocate to the Herndon Center, including plaintiff, but only four agreed.

On December 1, 2003, SBA sent 60 letters reassigning employees, including plaintiff, to Herndon, Virginia. Because an insufficient number of these employees accepted the reassignment, on December 16, 2003, a second round of reassignment letters were sent to an additional 54 employees.

On December 17, 2003, SUSAN WALTHALL, Deputy Associate Administrator for Field Operations, sent plaintiff a letter proposing her removal for failure to accept the directed reassignment.

On January 5, 2004, plaintiff wrote to WHITMORE requesting special consideration.

On January 6, 2004, WHITMORE informed plaintiff that he could not grant her request and that she would be removed effective January 24, 2004, for failure to accept the directed reassignment.

### A. GENDER-BASED DISCRIMINATION

We shall initially dispose of plaintiff's gender-based discrimination claim based on her termination. We find that plaintiff

CIVIL NO. 06-1461 (RLA)                                          **Page 43**

has failed to meet her prima facie burden on this particular cause of action. There is no indication in record as to how the challenged decision was applied in a discriminatory fashion either to women in general, or to plaintiff in particular, due to her sex.

Rather, according to MONIKA HARRISON, 114 employees were given directed reassignments. Of these, 67 were male and 47 female. Additionally, two DOPR male employees, including JUAN M. LOPEZ, plaintiff's subordinate at the Disaster Program, received reassignment letters along with plaintiff.

Accordingly, plaintiff's claim for termination based on sex discrimination is **DISMISSED.**

### B. RETALIATION

We shall now turn our attention to the arguments raised by plaintiff to rebuke defendant's proffered reasons for her termination as pretextual.

### 1.   Not a Union Member.

Plaintiff posits that inasmuch as she was not a Union member the criteria and methodology set forth in the MOU for relocating employees to Herndon did not apply to her. However, the fact that the factors set forth in the MOU were applied to non-Union members does not necessarily render the decision in plaintiff's case retaliatory. It is uncontested that at the time plaintiff was selected for reassignment, she was a GS-13 grade level employee and that she had reported spending 35% of her time on liquidation activities.

It is important to note that the work-related information used for plaintiff's selection was based precisely on a survey prepared by her. "[Plaintiff] was responsible for accurately reporting the percentage of her time spent on liquidation or liquidation support activities. The Cost Allocation Survey is completed by the employee and reviewed by their supervisor prior to submission. Ms. Rivera reported spending 35% of her time on liquidation activities." Interview Questions for MONIKA HARRISON (docket No. 63-20) ¶ 13 pp. 2-3.

Additionally, supervisors were also selected for manning the new center. "The staffing requirements at the new Herndon Center were not limited to non-supervisory positions. Since the Agency was centralizing its liquidation activities in Herndon, there was also a need for supervisory personnel. Supervisory personnel are exempt from bargaining unit status and, therefore, the Agency was not bound by the terms of the MOU with respect to the reassignment of such employees. However, the Agency determined that it would be fair and appropriate to apply the same reasonable terms that were negotiated with the Union to non-bargaining unit employees as well." Declaration of CALVIN JENKINS (docket No. 73-4) ¶ 4 p. 2.

## 2.   Disaster Employees.

Plaintiff further attempts to discredit the reasons set forth by defendant for selecting her for the reassignment by arguing that disaster employees were not included in the reassignment decision.[13]

However, according to WHITMORE, the decision to reassign employees included both disaster and regular funded employees. "The Agency did not distinguish between disaster and regular funded employees as the skill set required to liquidate a guaranteed loan is the same as that required for a disaster loan."[14] "In addition, the process of liquidating loans does not differ by loan type."[15]   See also, Declaration of CALVIN JENKINS (docket No. 73-4) ¶ 4 p. 2, ("In addition, the reassignment process applied to employees who liquidated either 7(a) loans or disaster loans, since the process of liquidating loans does not differ by loan type"); Interview Questions for MONIKA HARRISON (docket No. 63-20) ¶ 13 pp. 2-3 ("While the center will handle 7(a) loans or guarantee purchases initially, the

---

[13]   This notion was apparently due to misinformation. Initially, both the District Office and local Union were under the impression that disaster employees would not be affected by the reassignment apparently due to incorrect information provided by Office of Field Operations. However, this mistaken view was promptly corrected. See e-mail from PARDO to JUAN M. LOPEZ dated September 12, 2003 (docket No. 63-23).

[14]   Interview Questions for JOHN WHITMORE (docket No. 63-21) ¶ 13 p. 5.

[15]   Interview Questions for MONIKA HARRISON (docket No. 63-20) ¶ 13 pp. 2-3.

center is not limited in the type of work that can be completed there.")

### 3.   Plaintiff's Letter.

Plaintiff further contends that SBA's rejection of her reasons for declining immediate relocation constitute evidence of pretext. Contrary to plaintiff's allegations, WHITMORE acknowledged having reviewed plaintiff's January 5, 2004 letter prior to making his final decision to remove plaintiff.  Reference thereto also appears in the termination letter subscribed by WHITMORE which, in pertinent part, reads:

> In your written response dated January 5, 2004, you stated
> how difficult and inconvenient it would be to disrupt your
> family and relocate to a new geographic area. I have given
> full consideration to your response, to the management
> reason for this reassignment and to the mission of the
> Agency.

Letter to plaintiff dated January 6, 2004 (docket No. 63-27).

### 4.   Disciplinary actions taken against her during 2002 and 2003.

According to plaintiff, her termination was also in retaliation for alleged "disciplinary actions" taken against her in 2002 and 2003. Specifically, argues that "the persons who decided that [she] was eligible [sic] for the transfer were in fact aware of the disciplinary actions taken during 2002 and 2003, and one of them

(JOHN WHITMORE) was a member of the ad hoc committee that reviewed and dismissed the original discrimination charge filed in 2002 by Plaintiff and 2 other supervisors."[16]

However, disciplinary measures do not qualify as "protected conduct" for Title VII purposes. Coverage under the statute's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), is limited to reprisals taken for having opposed a practice made unlawful by Title VII or participating in a related proceeding.[17]

Hence, the only prior events which would qualify as "protected conduct" under the statute for purposes of her retaliation claim would be her November 2002 informal complaint and the administrative proceedings commenced with her initial EEO contact on June 30, 2003, challenging her two-day suspension.

We must note that the initial letter advising plaintiff of the impending transfer was written by MONIKA HARRISON, Chief Human Capital Center, on December 1, 2003, and upon plaintiff's refusal to accept her reassignment, the proposal for removal was decided by SUSAN WALTHALL, Deputy Associate Administrator for Field Operations on December 17, 2003. There is no indication that either of them or

---

[16]   Plaintiff's Opposition to Defendant's Motion For Summary Judgment (docket No. 67) p. 7.

[17] For the same reason plaintiff's September 17, 2002 complaint challenging a previous reprimand as retaliatory for having made disclosures regarding alleged government waste and abuse, gross mismanagement and violations of government regulations, i.e., whistleblower, does not qualify as protected conduct under Title VII either.

CIVIL NO. 06-1461 (RLA)                                                    Page 48

WHITMORE, for that matter, was familiar with plaintiff's alleged Title VII protected activities.

Further, we must point to the remoteness in time between the November 2002 informal complaint and WHITMORE's decision on January 6, 2004.

In sum, we find that plaintiff has failed to present evidence indicative that the reasons proffered by defendant for the entire process of setting up the centralized liquidation center as well as the method and criteria used for the selection of the employees are pretextual for retaliation. Plaintiff's selection for reassignment was based on the fact that she qualified under the neutral criteria set for by the Agency.

We must bear in mind that "courts may not sit as super personnel departments, assessing the merits - or even the rationality of employers' nondiscriminatory business decisions. Although the evaluation process may not have treated [plaintiff] fairly, there is simply no evidence that [defendant's] hasty evaluation was a pretext for unlawful discrimination." Rodriquez-Cuervos, 181 F.3d at 22 (citation and internal quotation marks omitted).

Based on the foregoing, plaintiff's retaliation claim based on her termination from employment is likewise **DISMISSED**.

## VI.  RETALIATORY HARASSMENT

In a rather generalized fashion, plaintiff argues that she was subjected to "retaliatory harassment" and points to the following

incidents as evidence thereof: (1) cessation of her designation as acting supervisor in February 2003; (2) an investigation in February 2003 regarding her use of subordinates' parking space, and (3) an e-mail dated September 22, 2003 charging her with not working enough.

In retaliation cases, "[t]he adverse employment action may be satisfied by showing the creation of a hostile work environment or the intensification of a pre-existing hostile environment." Quiles-Quiles, 439 F.3d at 9. *See also*, Noviello v. City of Boston, 398 F.3d 76, 89 (1st Cir. 2005) ("[T]he creation and perpetuation of a hostile work environment can comprise a retaliatory adverse employment action".) "[A] hostile work environment, tolerated by the employer, is cognizable as a retaliatory adverse employment action... This means that workplace harassment, if sufficiently severe or pervasive, may in and of itself constitute an adverse employment action sufficient to satisfy the second prong of the prima facie case for... retaliation cases." *Id*. (under Title VII). "Harassment by coworkers as a punishment for undertaking protected activity is a paradigmatic example of adverse treatment spurred by retaliatory motives and, as such, is likely to deter the complaining party (or others) from engaging in protected activity." *Id*. at 90.

"[R]etaliatory actions that are not materially adverse when considered individually may collectively amount to a retaliatory hostile work environment." Billings, 515 F.3d at 54 n.13.

"In looking at a claim for hostile work environment, we assess whether a plaintiff was subjected to severe or pervasive harassment

that materially altered the conditions of his employment. To sustain a claim of hostile work environment, [plaintiff] must demonstrate that the harassment was sufficiently severe or pervasive so as to alter the conditions of his employment and create an abusive work environment and that the [discriminatory] objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and [that plaintiff] in fact did perceive it to be so." Thompson v. Coca-Cola Co., 522 F.3d 168, 179 (1st Cir. 2008) (internal citations and quotation marks and brackets omitted).

"The environment must be sufficiently hostile or abusive in light of all of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Prescott v. Higgins, 538 F.3d 32, 42 (1st Cir. 2008) (citation and internal quotation marks omitted); Rios-Jimenez v. Principi, 520 F.3d 31, 43 (1st Cir. 2008); Torres-Negron v. Merck & Co., Inc., 488 F.3d 34, 39 (1st Cir. 2007).

"There is no mathematically precise test we can use to determine when this burden has been met, instead, we evaluate the allegations and all the circumstances, considering the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interfered with an employee's work

performance." Carmona-Rivera v. Commonwealth of Puerto Rico, 464 F.3d 14, 19 (1st Cir. 2006) (citation and internal quotation marks omitted).

"In determining whether a reasonable person would find particular conduct hostile or abusive, a court must mull the totality of the circumstances, including factors such as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The thrust of this inquiry is to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment." Noviello, 398 F.3d at 92 (citations and internal quotation marks omitted).

Plaintiff must provide "evidence of ridicule, insult, or harassment such that a court could find behavior on the part of the defendants that was objectively and subjectively offensive behavior that a reasonable person would find hostile or abusive." Carmona-Rivera, 464 F.3d at 19 (citation and internal quotation marks omitted). See also, Noviello, 398 F.3d at 92 ("rudeness or ostracism, standing alone, usually is not enough to support a hostile work environment claim."); De la Vega v. San Juan Star, Inc., 377 F.3d 111, 118 (1st Cir. 2004) (general claims of "humiliating and discriminatory treatment" not sufficient).

"[I]f protected activity leads only to commonplace indignities typical of the workplace (such as tepid jokes, teasing, or

aloofness), a reasonable person would not be deterred from such activity. After all, an employee reasonably can expect to encounter such tribulations even if she eschews any involvement in protected activity. On the other hand, severe or pervasive harassment in retaliation for engaging in protected activity threatens to deter due enforcement of the rights conferred by statutes." <u>Noviello</u>, 398 F.3d at 92.

Proving retaliatory intent is crucial. Hence, the purpose behind the harassment must be to retaliate for the protected conduct, that is, it must be motivated by plaintiff's exercise of her statutory rights. <u>Carmona-Rivera</u>, 464 F.3d at 20; <u>Quiles-Quiles</u>, 439 F.3d at 9.

Causation may be established by the temporal proximity between the harassment and the protected conduct. *See, i.e.*, *id*. 439 F.3d at 9 (intensified harassment shortly after filing EEOC complaint).

Even though "[t]he existence of a hostile environment is determined by the finder of fact... that does not prevent a court from ruling that a particular set of facts cannot establish a hostile environment as a matter of law in an appropriate case." <u>Billings</u>, 515 F.3d at 47 n.7.

We begin by examining the events which transpired subsequent to May 2003 when IRIZARRY and PARDO became aware of the informal discrimination charge to determine whether, either individually or collectively, they may be deemed sufficiently adverse to meet plaintiff's *McDonnel Douglas* burden. Further, whether these were causally connected to the protected activity. Lastly, assuming a

prima facie case of retaliation can be derived from the facts as presented, whether defendants' proffered legitimate non-discriminatory reasons for the challenged events have been adequately challenged as pretextual.

**1. Discontinued as Acting Supervisor in February 2003.**

Plaintiff charges that the practice of naming her "acting" supervisor in the absence of her superior was discontinued as part of the retaliation process. Specifically, she alleges that:

> 28.   Prior to filing the discrimination complaint in 2003, Plaintiff usually was designated as 'acting' supervisor in Ibern's absence, and was included in office discussions with other supervisors. After filing her complaint, Pardo instructed Ibern not to delegate this responsibility to her, and gave instructions that she be excluded from supervisors' meetings and discussions.

Plaintiff's Additional Statements of Material Facts (docket No. 68) p. 10.

The decision to exclude plaintiff appears in a February 6, 2003 e-mail from IRIZARRY to IBERN (docket No. 70-3) and reads:

> I have been instructed by CO [Central Office] that you cannot list Ruth Rivera in the line of succession to perform the functions of the ADD/ED. Based on this and until further notice, please refrain of (sic) assigning regular program functions or work you had planned for her.

We find this evidence not useful to plaintiff's retaliation harassment claim. Apart from the fact that, as previously discussed, there is no evidence that IRIZARRY was aware of the November 2002 informal complaint prior to May 2003, the e-mail specifically notes that the instructions originated from Central Office a fact which has not been contested.

**2.   Investigation Regarding Use of Subordinates' Parking Space in February 2003.**

In support of her retaliatory harassment claim plaintiff further argues that an investigation was instigated against her for having used her subordinates' parking spaces. Specifically, she alleges as follows:

31.   As part of the retaliatory actions Pardo and others took against Plaintiff, they accused her of "receiving favors" from subordinates and started an investigation against her, because [her subordinates] let her use their parking spaces to her [sic] from time to time. Plaintiff has had 2 back surgeries and had previously received a parking space as accommodation for 3 months. She believes the accommodation was not continued because of the retaliation against her. Plaintiff was not the only supervisor at her level who shared parking space with her subordinates.

Plaintiff's Additional Statements of Material Facts (docket No. 68) ¶ 31 pp. 10-11.

An investigation into plaintiff's use of her direct subordinates' parking space ensued on or about February 19, 2003, due to an anonymous call received by LIANA GONZALEZ, District Counsel. The reason for the investigation was that the situation created an appearance of impropriety because it could be deemed a gift which could affect the employee's performance assessment.

As part of the investigation plaintiff, as well as the other personnel involved, were interviewed. It became apparent the reason why the subordinates had offered plaintiff the use of their parking spaces were due to her health condition.[18] Plaintiff was not disciplined as a result of this incident. [plaintiff's depo. p. 42]

Again, this incident occurred prior to May 2003. Absent evidence that the responsible decision-makers were aware of plaintiff's protected conduct, there cannot be a causal relationship between plaintiff's informal discrimination complaint and the investigation.

---

[18] Plaintiff complains that her request for handicapped parking went unanswered by the Agency. However, it must be noted that on March 5, 2003, HELEN JACOBSON responded to an inquiry regarding plaintiff's petition for special parking arrangements noting that "[i]n order for the employee to be entitled to an accommodation under the ADA she needs to have medical documentation that establishes that she has an 'impairment that substantially limits a major life activity. Since her doctor's note does not even provide a diagnosis or any other information about her condition we need to obtain additional medical certification." Investigation (docket No. 70-4). Further, via an e-mail dated April 8, 2003, Rosa Maria Lagomarsini advised plaintiff that the Building Manager had declined their request for a temporary handicap parking made on her behalf. The building manager offered instead "a parking space 3 blocks away" with a shuttle service to the office building. (Docket No. 70-4)

Further, there is no evidence of pretext. The inquiry appears justified according to the underlying facts given the possibility of a conflict of interest situation.

**3.    E-mail from IRIZARRY dated September 22, 2003 intimating that plaintiff might not have enough work.**

Lastly, plaintiff contends that an e-mail sent by IRIZARRY allegedly charging that plaintiff had no work was part of the retaliatory harassment. According to plaintiff, IRIZARRY went by her work area when plaintiff was in a cubicle with her supervisor and one of the employees she supervised. IRIZARRY subsequently sent the following e-mail to IBERN with copy to PARDO and PAPPAS on September 22, 2003 (docket No. 68-12) p. 2:

> As discussed, if Ms. Rivera and her staff do not have enough work to sustain an 8 hour work day, as you indicated, you as her supervisor and with her assistance, must identify other disaster related activities or initiatives where they can perform in conformance to their position descriptions and grade. We simply cannot allow staff in this office with nothing to do. It is not good for the morale of this office and it is completely unacceptable behavior.
>
> Please provide me with a work plan on how you are planning to cure this situation.

Plaintiff responded to IRIZARRY's inquiry via an e-mail on September 30, 2003, detailing the work carried out by the Disaster Division and justifying their full-time schedule.

We are not certain whether plaintiff argues that this incident came as a result of her November 2002 complaint or her June 2003 EEO contact claim. Regardless, we find that it is merely an isolated incident not "sufficiently severe or pervasive" as required for retaliatory claims.

In sum, even though the court must review the record in the light most favorable to plaintiff, we find that she failed to establish the existence of material issues of fact regarding her retaliatory harassment claim which require resolution at trial. Based on the uncontested evidence presented, no reasonable jury could find that the challenged events were geared to retaliate against plaintiff for having filed either the November 2002 and/or the June 2003 claims.

Accordingly, the retaliatory harassment claim must also be **DISMISSED** as a matter of law.

### VII. <u>CONCLUSION</u>

Based on the foregoing, defendant's Motion for Summary Judgment (docket No. **63**)[19] is **GRANTED**.

---

[19]   See Opposition (docket No. **67**); Defendant's Reply (docket No. **73**) and Surreply (docket No. **70**).

**CIVIL NO. 06-1461 (RLA)**                                    **Page 58**

Accordingly, the sex discrimination and retaliation claims asserted in the complaint are hereby **DISMISSED.**

Judgment shall be entered accordingly.

IT IS SO ORDERED.

San Juan, Puerto Rico, this 25th day of August, 2009.


                                    S/Raymond L. Acosta
                                    RAYMOND L. ACOSTA
                                 United States District Judge